UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **SUSAN CARNABY, INDIVIDUALLY** | § | |
| **and as REPRESENTATIVE OF THE** | § | |
| **ESTATE OF ROLAND CARNABY,** | § | |
| **DECEASED,** | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | **CIVIL ACTION NO. 4:08-cv-1366** |
| | § | |
| **CITY OF HOUSTON, CHARLES** | § | |
| **FOSTER, AND ANDREW J.** | § | |
| **WASHINGTON,** | § | |
| | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

Before the Court are Defendants Charles Foster and Andrew Washington's Motion for Summary Judgment (Doc. No. 76) and Plaintiff's Motion to Supplement (Doc. No. 123). After considering the arguments made in briefing and the relevant law, the Court finds that Plaintiff's Motion to Supplement should be granted and Defendants' Motion for Summary Judgment should be granted.

## I.    BACKGROUND

### A.  The Traffic Stop

This case arises out of the tragic shooting of Roland Carnaby ("Carnaby") by two members of the Houston Police Department ("HPD"), Officer Charles Foster ("Foster") and Sergeant Andrew Washington ("Washington") that occurred on the morning of April 29, 2008.[1]

---

[1] These facts are either uncontested or, for the purposes of this Motion only, presented in the light most favorable to Plaintiff.

(Doc. No. 75, Ex. G.)[2]  On the day of the shooting, Charles Starks ("Starks"), a senior police officer who has been with HPD for eighteen years, was working traffic enforcement on Texas State Highway 288 ("288'). (Starks Dep. 4:7-14; 7:1-5, Nov. 25, 2008.)  Starks observed a 2008 Black Jeep Commander, driven by Carnaby, traveling southbound at 75 miles per hour in a 60 miles per hour zone. (Starks Dep. 7:10-18; Starks Aff, Doc. No. 76, Ex. A.)  The windows of Carnaby's vehicle were darkly tinted. (Doc. No. 75, Ex. G.)

Starks decided to conduct a traffic stop. (Starks Aff.)  When Starks first approached Carnaby's vehicle, he asked to see his driver's license, and Carnaby quickly identified himself as a CIA agent and flashed some sort of badge or credential. (Starks Dep. 29:1-10; Starks Aff.)[3] Carnaby's hands were shaking, and he would not let Starks inspect his credentials for "national security" reasons. (Starks Aff.)[4]  Starks did not know how to identify CIA credentials. (Starks Dep. 29:11-13.)

---

[2] The Court draws some of these facts from Houston's Motion for Summary Judgment. (Doc. No. 74.)  On summary judgment, district courts are allowed, but not required, to consider facts presented elsewhere in the record. *See Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 n. 7 (5th Cir. 1992).

[3] The initial traffic stop, the chase, and the shooting were all captured by the video cameras mounted on Starks's and Foster's patrol cars. (Doc. No. 75, Ex. A; Pls. Ex. 30-31.)

[4] Plaintiff focuses a great deal of her briefing on Carnaby's status as a CIA agent. While these facts are ultimately not relevant to the legal questions presented in this Motion, the Court takes a moment to discuss them here. According to Michael Bechaud, a former Federal Bureau of Investigation ("FBI") employee, Carnaby worked as a confidential informant for the FBI from approximately 1992 to 1994. (Bechaud Dep. 11:16-25;16:7; 26:1-9, March 3, 2009.) Carnaby would investigate certain targets of interest and report back to the FBI. (*Id.* at 20:19-25.) The FBI stopped using Carnaby as a confidential informant because it discovered that some of the information he provided was not credible or was from open source material.  Carnaby also "had a habit of telling too many people that he was working with law enforcement." The FBI therefore ordered Bechaud to stop using Carnaby as a confidential informant. (Bechaud Dep. 58:11-24.)

While working with the FBI, Carnaby did provide information about an assassination plot against President George Herbert Walker Bush, the first World Trade Center bombing, an Iranian counterfeiting scheme,  a corrupt U.S. Customs official selling classified information, shipping of nuclear materials from Russia, and delivery of nuclear fuel rods to Syria and Iran. (Bechaud Dep. 81-83.) Plaintiff also introduced the testimony of James Napolitano, a former Secret Service agent, who used Carnaby as a confidential informant and an investigator from 1991 until 1993. (Napolitano Dep. 12:18-20; 16:19-20, July 31, 2009.) Further, Carnaby was the president of the local chapter of the Association for Intelligence Officers, which hosted events that were attended by local law enforcement officials. (Garcia Dep. 8:1-8; Zavalla HPD Witness Statement, April 29, 2008, Doc. No. 114, Ex. 20 ("Zavalla Witness Statement").)

Starks ran Carnaby's license plate number and found that the vehicle was registered to a street address in Pearland, Texas. Starks then ran a background check and found that Carnaby was arrested for disorderly conduct in 1992 and had a concealed hand gun license. (Starks Dep. 32:15-23; Starks Aff.) Further, Carnaby's vehicle displayed a license plate holder from the international security company, Blackwater Worldwide. (Starks Aff.) These facts made Starks suspicious—he believed that a CIA vehicle would be registered to a more discreet address and would not be equipped with a Blackwater license plate holder. (*Id.*) He also found it strange that a federal agent would have a criminal history or a concealed handgun license because federal agents do not need a license to carry a gun. (*Id.*) Starks contacted the HPD Major Offenders Division ("Major Offenders"), which investigates police impersonators. Major Offenders informed Starks that Carnaby was not a CIA agent and advised him that, if possible, he should book Carnaby on a traffic charge in order to recover the CIA credentials Carnaby had displayed. (Starks Aff.)

When Starks returned to Carnaby's vehicle, Carnaby handed Starks his cell phone and asked him to talk with someone. The person on the phone identified himself as Frank Zavalla, a member of the HPD, and Starks asked for a number where he could call him back. (Starks Aff.) Carnaby had called Zavalla, an officer in HPD's Internal Affairs Division ("IAD"), and told him that he had been stopped and that the officer was giving him a hard time.[5] Carnaby asked Zavalla to speak to the officer, and Zavalla told Carnaby that if he got a ticket he could take care of it in municipal court. (Zavalla HPD Witness Statement.) Starks then called Zavalla and told

---

[5] Zavalla had met Carnaby two years before while working at his approved second job at Spec's Liquor Store. When Carnaby introduced himself to Zavalla, he flashed credentials and told Zavalla that he was a CIA agent. Carnaby shopped at Spec's a few times a month and would visit with Zavalla, asking him if he knew certain officers. Carnaby invited Zavalla to events hosted by the local chapter of the Association of Intelligence Officers. (Zavalla Witness Statement.)

him that Carnaby was acting strange and nervous, presented himself as a CIA agent, and had a red and blue light on the dash. (Zavalla Witness Statement.)  Zavalla informed Starks that he knew Carnaby personally and that he believed Carnaby was a CIA agent, but he was not sure. (Starks Dep. 29:21-30:17; 30:21-31:2; Zavalla Witness Statement.)  Starks told Zavalla that he had spoken with Major Offenders which had ordered him to write a report and release Carnaby. (Zavalla Witness Statement.)  Zavalla then called Carnaby back and told him that Starks was going to "knock out a quick report" and release him.  Carnaby thanked him and hung up.  (*Id.*)

At some point, Starks called for backup, and Foster arrived at the scene.  (Doc. No. 75, Ex. G.)  Starks also contacted his supervisor, Washington, who told Starks that he was en route. (Starks Dep. 5:1-5; Doc. No. 75, Ex. G.)  Starks then approached Carnaby's vehicle again. He told Carnaby that one of his supervisors was en route to the scene and asked Carnaby to exit the vehicle.  Carnaby said "Don't do this to me." Starks again told him to exit the vehicle.  Carnaby said something Starks did not understand, and Starks asked Carnaby if he was armed. Carnaby again said something Starks did not understand, and then he drove away.  (Starks Dep. 105:16-24.)  Starks did not see a gun in Carnaby's vehicle before he drove away.  (Starks Dep. 32:9-12.)

### B. The Chase and the Shooting

Carnaby initially headed south on Highway 288 before exiting and then returning to 288, traveling northbound.  (Pl. Ex. 30-31.)  Starks and Foster pursued Carnaby in their patrol cars. (Doc. No. 75, Ex. G.)  Washington joined the chase at Interstate 45.  (*Id.*)   At some point during the chase, Carnaby called Zavalla again and said "Hey Frank, I fucked up." (Zavalla Witness Statement.) He told Zavalla that he had left the scene.  When Zavalla advised Carnaby to pull over and do what the police commanded, Carnaby told him that it might be a "set up" from "the agency." (*Id.*)

4

During the chase, Foster reported over the radio that Carnaby threw an object out of his vehicle. (Starks Dep. 107:10-12; Pls. Ex. 30-31.)[6] Starks reported over the radio that Carnaby was a police impersonator and that he was armed; additional units were requested. (Doc. No. 75, Ex. G; Pls. Ex. 30.)

After exiting the West Loop, Carnaby stopped suddenly on the service road directly over Buffalo Bayou. (Starks Dep. 78:1-7.) Because of Carnaby's sudden stop, Washington drove his patrol car slightly ahead of Carnaby's vehicle before stopping. Foster and Starks stopped a few feet behind Carnaby vehicle, but Starks could not back his car up without blocking the driver's side door of Foster's patrol car. (Doc. No. 75, Ex. G.) The chase had lasted approximately fifteen minutes and covered about twenty miles. (Foster Dep. 60:14-18, Oct. 30, 2008.)

Foster, fearing that he would be pinned in his patrol car if Starks backed up, and seeing that Washington was in his line of fire, decided to approach the passenger side of Carnaby's vehicle. Washington initially took a position at the front of his vehicle; however, as he saw Foster approaching the passenger side, he could also see Carnaby inside the car, talking on his cell phone. Washington believed that Carnaby was ready to be taken into custody, so he also approached the vehicle's passenger side and did not order Foster to retreat. (Doc. No. 75, Ex. G.)

Starks exited his patrol car, walked around the rear of his and Foster's patrol cars and could see Washington and Foster attempting to communicate with Carnaby through the passenger window. (Starks Dep. 95:1-8.) The passenger side window of Carnaby's vehicle was rolled down about four inches. Starks then walked around the rear of his patrol car to driver's

---

[6] Police later searched for this object but did not recover it. (Starks Dep. 108:21-25.) Later, a canine patrol alerted to drugs on left rear tire of the car, where the alleged object hit the car after it was thrown out. (Foster Dep. 117:16-22.)

side of Carnaby's vehicle to cover Foster and Washington.  Starks believed that Foster and Washington were trying to get Carnaby to exit on the passenger side.  (*Id.* at 96:6-25.)

When Starks reached the front bumper of his patrol car, he saw that Carnaby was not exiting his vehicle, and Starks decided to try to communicate with Carnaby.  He approached the driver's side of Carnaby's vehicle and jiggled the door handle, tapped on the window, and motioned for Carnaby to roll it down. (Starks Dep. 97:1-8.)  Carnaby did not respond to these attempts at communication.  (*Id.* at 97:10-11.)  Starks found that the door was locked.  (Starks Aff.)  Starks then retreated back to his patrol car, where he was joined by Officer Erik Termeulen, who was working SWAT duty that day.  (Starks Dep. 97:19; Starks Aff; Termeulen Aff., Doc. No. 76, Ex. B.)  At that point, Officer Termeulen told Starks that Foster and Washington were breaking in the window, and Starks could hear something striking the car. (Starks Dep. 98:1-4.)

While remaining in his vehicle, Carnaby stuck his hand out with his cell phone in his right hand, and Washington told him to put the cell phone down.  Washington told Carnaby that he needed to see his hands and asked him to unlock the door.  Carnaby then rolled the window back up without obeying Washington's orders to show his hands or unlock the door. (Washington Dep. 67:5-68:3; 68:24-69:4, Oct. 30, 2008.)  Washington continued trying to communicate with Carnaby after the window was rolled up but Carnaby did not comply with his commands.  (Washington Dep. 69:8-18.)  Through the window's dark tint, Foster could see a silhouette of Carnaby talking on his cell phone, switching it from his left to right hand and alternatively reaching his other hand between the seat and the console.  (Foster Dep. 75:1-8; Washington Dep. 66:20-67:4.)  As time went by, Carnaby switched the cell phone from hand to hand more frequently and at a faster pace. (Washington Dep. 75:19-25.)

During the traffic stop, Carnaby had also called Dennis Franks, a Supervisory Special Agent with the FBI in Houston. (Franks Aff, Doc. No. 114, Ex. 19.)  Carnaby told Franks he had been stopped and asked Franks to speak with the officer.  Franks told him he would talk to the officer but that he could not get Carnaby out of a ticket.  (*Id.*)  When Carnaby told Franks that he was driving away from the scene, Franks told him to pull over and do what the officer said.  Carnaby told Franks that he was driving to the FBI office and asked if Franks was there.  Franks advised Carnaby to pull over, and Carnaby told him he was running out of gas.  (*Id.*)  Franks continued to talk on the phone with Carnaby.  At one point, he heard officers shouting at Carnaby to roll down his window and the sound of breaking glass—then the connection was lost. (*Id.*)

Foster asked to break the window, and Washington initially told him not to, but then gave him an order to do so. (Foster Dep. 70:17-20; 77:21-23.)   Prior to breaking the window, Washington told Carnaby to show his hands and exit the vehicle. (Foster Dep. 79:10.) Washington shouted several times that they were going to break the window.  (Washington Dep. 66:20-67:4.) Foster hit the window four or five times with a police baton.  After the window shattered, Foster put the baton down and unholstered his weapon, and Foster and Washington both said "let me see your hands," but they did not tell Carnaby to exit the vehicle (Washington Dep. 70:1-7; Foster Dep. 79:11-15.) Washington then thought Carnaby was ready to comply with the police and started to make his way around the front of the vehicle when he saw Carnaby start to exit on the driver's side.  (Washington Dep. 66:20-67:4; 70:14-15.)

Starks saw Washington round the front of the car and approach it from the driver's side. (Starks Dep. 98:15 -16.)   Carnaby began to exit his vehicle and it appeared to Starks that his left hand was reaching underneath the driver side's seat. Carnaby then pulled his body completely

out of the car, revealing his hands. (Starks Dep. 99:1-8; Starks Aff.) Carnaby held a silver object in his hand that Starks believed was a gun. (Starks Aff.)[7] Starks would have shot at Carnaby but for the fact that Washington was in his line of fire. (Starks Aff.)  Termeulen also would have discharged his weapon had Washington not been in his line of fire. (Termeulen Aff.)

As Washington rounded the front of Carnaby's vehicle, he saw Carnaby exit with his head up, looking at Washington.  Washington did not see Carnaby stand erect, but his hands were up, he turned back to the vehicle as he was exiting, and the two men were "eyeball to eyeball."  Washington then saw a dark, shiny object in Carnaby's hands. (Washington Dep. 70:21-71:7.)  Washington thought Carnaby had a weapon. (Washington Dep. 71:10.)

From Foster's vantage point, he saw Carnaby exit the vehicle, turn around and reach under the driver's side seat.  Foster yelled "show me your hands, show me your hands." Washington was moving around the front of the car, and Foster saw Carnaby look up at Washington.  Carnaby was watching Washington as he was coming around the car, and the closer Washington got, the more frantically Carnaby reached under the seat.  When Washington reached the front of the car, Foster saw Carnaby rise up quickly and point his arm out.  Foster saw something gray in Carnaby's hand and thought it was a pistol.  Foster thought that Carnaby was going to shoot Washington or turn and shoot him, and he fired his weapon. (Foster Dep. 118:9-23.)

Foster and Washington discharged their service weapons almost simultaneously, and both discharged one round. (Doc. No. 75, Ex. G; Doc. No. 76, Ex. K.)  Starks heard two rapid gun shots and saw Carnaby fall to the ground. (Starks Dep. 99:10-11.)  Carnaby was struck by one round from Foster's gun. (Doc No. 75, Ex. G.)  Less than two minutes passed between the time

---

[7] The object in Carnaby's hand was actually a cell phone. (Foster Dep. 77:3-4.)

Carnaby's vehicle stopped over Buffalo Bayou and the police helicopter reported shots fired. (Doc. No. 76, Ex. K.)

After the shooting, the officers called for an ambulance to take Carnaby to Ben Taub Hospital. (Pls. Ex. 30-31.) Carnaby lay handcuffed on his side. When the Houston Fire Department arrived on the scene, they found that Carnaby had suffered a gun shot wound to the lower back, near his spine, and he was combative when he was not handcuffed. (Doc. No. 75, Ex. E.) Carnaby was handcuffed to a stretcher and put in an ambulance. Medics attempted CPR in the ambulance, and Carnaby was declared dead in the emergency room. (*Id.*) Police later recovered a Glock 9 mm, Sig Sauer 9 mm and one Remington 870 Express Magnum from Carnaby's vehicle. (Doc. No. 76, Ex. E.) Carnaby had no weapon on his person, but police did recover a gray and black cell phone from the ground near his fallen body. (*Id.*)

HPD has a policy governing officers' behavior during high risk vehicle approaches ("Policy 600-34.") (Doc. No. 75, Ex. H, General Order 600-34.) Policy 600-34 observes that "[a]rmed suspects in a vehicle have a superior tactical position with respect to officers attempting an approach. In addition, any approaching officer's line of sight may be disrupted by window tinting or the vehicle itself. The inability to view the occupants of a vehicle poses an extreme hazard to approaching officers as well as vehicle occupants." (*Id.*) It therefore mandates that "[b]efore approaching any vehicle considered high-risk, officers will first attempt to establish verbal communications with suspects [and] [o]fficers will maintain a position of advantage during this attempt." (*Id.*) Policy 600-34 sets forth steps officers should follow during high risk vehicle approaches:

    a) attempt to establish verbal communication
    b) if it can be established, have suspect exit the vehicle
    c) each suspect should be secured before others exit

\* \* \*

f) if suspect refuses to comply with officers (i.e., remains inside the vehicle), and the suspects are known to be armed, officers will use the police guidelines set froth in General Order 600-05, Special Threat Situations, section 3, Plan of Action, subsection "Patrol Officers."

(*Id.*)

HPD also has a policy discussing officers' use of discretion when confronting suspects ("Policy 200-8"). (Doc. No. 75, Ex. G.) Policy 200-8 requires officers to use behavior which is "reasonable and prudent." (*Id.*) "Employees are expected to exercise sound judgment at all times." (*Id.*) As to supervisory conduct, Policy 200-8 states that "[s]upervisors who fail to take appropriate action when they are aware of or should have been aware that an employee was in violation of the law or department policy will be held accountable." (*Id.*) Finally, HPD has a deadly force policy as well, which states that "the use of deadly force will be limited to those circumstances in which officers reasonably believe it is necessary to protect themselves and others from the imminent threat of serious bodily injury or death" ("Policy No. 600-17"). (Doc. No. 75, Ex. I, General Order 600-17.)

After the shooting, HPD's Internal Affairs Division ("IAD") concluded that the officers reasonably believed they needed to pursue Carnaby after the initial traffic stop because Starks believed Carnaby was an armed felon, and he needed Carnaby's allegedly false CIA identification for a forgery charge. Carnaby might have destroyed the identification, which would have made prosecution impossible. (Doc. No. 75, Ex. G.) IAD found, however, that Foster's decision to "[advance] upon a high risk vehicle after obtaining a position of cover was imprudent and not consistent with the principles set forth in policies and procedures of the department regarding high-risk vehicle approaches." There were "inadequate ... exigent circumstances" to justify Foster's failure to obtain a position of advantage and attempt to first establish verbal communications. (*Id.*) The report further found that, while Washington was

correct to position himself at the front passenger side of his patrol car, he should have ordered Foster not to approach the passenger side of the car. IAD concluded that Washington could have easily commanded the situation from the relative safety of the front of his patrol car. Carnaby talking on cell phone "did not mitigate allowing Foster to depart from established protocol." (Doc. No. 75, Ex. G.) "Once Foster was standing at the window, a high-risk vehicle approach was no longer a practical undertaking." (*Id.*)   The IAD report did find that Carnaby's actions dictated the use of deadly force, and that both Foster and Washington were justified in shooting at Carnaby. (*Id.*)

As a result of the IAD report, Foster was given a written reprimand. (Foster Dep. 9:1-8.)[8] At the time of their Motion for Summary Judgment, both Foster and Washington were planning on appealing the IAD decision. (Foster Dep. 9:9-12; Washington Dep. 29:7-8.) On July 24, 2008, the 183rd Harris County Judicial Grand Jury "no billed" Sergeant Washington and Officer Foster in the shooting death of Carnaby. (Doc. No. 75, Ex. G.)

Foster testified that he believed he established verbal communication with Carnaby while in a position of advantage, in accordance with Policy 600-34. (Foster Dep. 22:1-15.) He admits that he was not behind cover while bashing the window. (*Id.* at 76:12-16.) He does not know if he followed the procedures described in section (f) related to "Special Threat Situations." He has looked over the policy on Special Threat Situations (General Order 600-5) but does not remember it. (Foster Dep. 23:5-10.) Washington testified that he does not know if there is an established time frame for attempting to establish communication, as described in Policy 600-34. (Washington Dep. 24:1-4.) He has not had any training regarding how long officers should attempt to establish communication with the suspect in the vehicle. (Washington Dep. 25:1-7.)

---

[8] Defendants' Motion for Summary Judgment indicates that Washington was disciplined by being suspended for one day without pay for his perceived supervisory deficiencies related to the approach. (Doc. No. 74 ¶ 6.11 n. 34.) The Court was unable to verify Washington's punishment in the record.

HPD patrol cars are equipped with loud speakers officers can use to communicate with suspects. (Foster Dep. 59:6-25.) On the day of the incident, the loud speaker on Foster's car was working. (Foster Dep. 79:25-80:1.) Both Foster and Washington felt that using the loud speaker to communicate with Carnaby would not be effective. (Foster Dep. 120:1-11; Washington Dep. 30:15-19.)

Plaintiff, Carnaby's widow, filed suit against Houston, Foster, and Washington in both her individual capacity and as representative of Carnaby's estate. Plaintiff alleged that Foster and Washington violated Carnaby's Fourth Amendment right by using excessive force, his Fourteenth Amendment right by denying medical treatment, and engaged in a conspiracy to deny Carnaby his constitutional rights. Plaintiff further alleges the state law claims of assault and battery and intentional infliction of emotional distress.[9] This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II. ANALYSIS

### A. Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899,

---

[9] It is unclear from Plaintiff's claim whether her state law claims are directed at Foster and Washington or Houston. Regardless, Foster and Washington do not address these claims in their Motion for Summary Judgment.

902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 575, 586 (1986)).

### B. Section 1983 Claims

Section 1983 provides injured plaintiffs with a cause of action when they have been deprived of federal rights under color of state law. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998). The statute reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. In order to state a cause of action under § 1983, a plaintiff must (1) allege a violation of rights secured by the constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person [or entity] acting under color of state law. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d at 215.

### 1. Qualified Immunity

Officials sued in their individual capacities are protected by qualified immunity unless their acts violate a constitutional right clearly established at the time. *Sanchez v. Swyden*, 139 F.3d 464, 466-467 (5th Cir. 1998). "The doctrine of qualified immunity serves to shield a

government official from civil liability for damages based upon the performance of discretionary functions." *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 284 (5th Cir. 2002). A defendant asserting qualified immunity is not required to conclusively establish the defense, as is required for other affirmative defenses. *Cousin v. Small*, 325 F.3d 627, 632 (5th Cir. 2003). "The moving party is not required to put forth evidence to meet its summary judgment burden for a claim of immunity. It is sufficient that the movant in good faith pleads that it is entitled to absolute or qualified immunity." *Id.* (quoting *Beck v. Tex. State Bd. of Dental Exam'rs*, 204 F.3d 629, 633 (5th Cir. 2000)). "Once the [movant] *asserts* this affirmative defense, the burden shifts to the plaintiff to rebut it. *Id.* (emphasis and alteration in original). To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present "absolute proof," but must offer more than "mere allegations." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 383 (5th Cir. 2009) (citing *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir.1991)).

When a defendant pleads qualified immunity as an affirmative defense and moves for summary judgment on that basis, a court must decide (1) whether the facts alleged or shown by the plaintiff made out a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. *Ontiveros*, 564 F.3d at 383. District courts are allowed to exercise discretion in deciding which of these two prongs to address first. *Pearson v. Callahan*, --- U.S. ---, 129 S.Ct. 808, 818 (2009). A right is "clearly established" if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Qualified immunity is applicable unless the defendant's conduct violated a clearly established constitutional right. *Ontiveros*, 564 F.3d at 383.

If the plaintiff alleges a violation of a clearly established constitutional right, the court must then consider whether the defendant's "actions were objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004). "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Glenn v. City of Tyler*, 242 F.3d 307, 317 (5th Cir. 2001). "The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated" the plaintiff's asserted constitutional or federal statutory right. *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001).

### 2. Excessive Force

If a law enforcement officer uses excessive force in the course of making an arrest, the Fourth Amendment guarantee against unreasonable seizure is implicated. *King v. Chide*, 975 F.2d 653, 656 (5th Cir. 1992). To prevail on her excessive force claim, a plaintiff must establish "(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ontiveros*, 564 F.3d at 382 (quoting *Freeman v. Gore,* 483 F.3d 404, 410 (5th Cir.2007)). The killing of a fleeing suspect is a seizure under the Fourth Amendment, and is therefore constitutional only if reasonable. *Tennessee v. Garner*, 471 U.S. 1, 6 (1985).

An officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others. *Mace v. City of Palestine,* 333 F.3d 621, 623 (5th Cir.2003). The reasonableness of the use of deadly force "must be judged from the perspective of a reasonable officer on the scene, rather than with the

20/20 vision of hindsight." *Ontiveros*, 564 F.3d at 382 (quoting *Graham v. Connor*, 490 U.S. 386, 396-97, (1989)). The standard is an objective one: "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (quoting *Graham*, 490 U.S. at 397). "[T]he ultimate determination of Fourth Amendment objective reasonableness is a question of law." *Ramirez*, 542 F.3d at 128 (citing *White v. Balderama*, 153 F.3d 237, 241 (5th Cir. 1998)).

Defendants argue that, from the beginning of his interaction with the police, Carnaby refused to cooperate and obey lawful orders. Instead of complying with Officer Starks' order to exit his vehicle, Carnaby drove away, leading the officers on a high speed chase. He did not comply with Washington's repeated commands to show his hands. Further, Defendants contend that they observed Carnaby switching his cell phone from hand to hand while reaching under his seat and then, without being ordered to, Carnaby exited the vehicle and made "the fatal furtive movement of reaching under the driver's seat of his vehicle." (Doc. No. 76 ¶ 6.5.) When Foster saw Carnaby turn toward Washington with a metal object in his hand, he believed Carnaby had a pistol and was going to shoot Washington. Washington, Starks, and Termeulen all testified that they had the same belief, that Carnaby had reached under the seat for a weapon and that they and their fellow officers were in immediate danger.

Plaintiff responds that "the parties present evidence to support two materially different scenarios leading to [Carnaby's] death which can only be solved by a jury ...." Plaintiff asserts that, as Carnaby obeyed the officers' commands to get out of the vehicle, Washington ran to the front of the vehicle to the driver's side and slammed Carnaby with the door, causing Carnaby to drop his cell phone. Foster shot Carnaby as he attempted to retrieve the phone. At one point in

her briefing, Plaintiff asserts that Foster "shot an unarmed man in the back when he knew he had a cell phone in his hand that he had just dropped." (Pl. Resp. at 7.)

Plaintiff has also introduced the expert testimony of Roger Clark, a retired member of the Los Angeles County Sheriff's Department, on the subject of police procedure.[10] (Doc. No. 114, Ex. 21-22.) Clark criticizes the officer's actions leading up to the shooting. (Doc. No. 114, Ex. 21.)[11] Specifically, he argues that, if the officers had not violated procedure by breaking cover and approaching the vehicle, instead of maintaining a position of advantage, the shooting might not have occurred. Further, he argues that the fact that a police siren was left on during the incident made it difficult for officers to communicate with Carnaby.

The Fifth Circuit's opinion in *Young v. City of Killeen* is instructive, given the facts before the Court. 775 F.2d 1349 (5th Cir. 1985). In *Young*, a police officer observed an apparent drug transaction between two men in a car and a pedestrian. The officer approached the suspects in his patrol car, with the lights flashing. The officer blocked the car's path with his patrol car so the two suspects in the car could not flee. The officer then left his patrol car and ordered the two passengers to exit their vehicle. When the driver of the vehicle stepped out of the car, he appeared to reach under the seat or floorboard of the vehicle and the officer, thinking he was reaching for a weapon, shot and fatally wounded him.

On summary judgment, the district court found that the officer's actions constituted excessive force because he had acted negligently and contrary to good police procedure by failing to use his radio, failing to call for back-up, placing his patrol car in a "cut off" maneuver,

---

[10] In an earlier Order, the Court limited the scope of Clark's expert testimony. (Doc. No. 122.)

[11] To challenge Clark's conclusions, Foster and Washington presented the reports of three experts: Jim Dozier, Former Executive Director of the Texas Commission on Law Enforcement, Terry Bratton, an instructor at the HPD Police Academy, and Michael Dirden, Assistant Chief in Charge of HPD's Criminal Investigations Command. (Doc. No. 76, Exs. F-H.) Because the Court finds that, as a matter of law, Clark's conclusions do not bear on Foster and Washington's use of excessive force, it will not discuss the conclusions of these rebuttal experts.

ordering the two men to exit the vehicle instead of issuing an immobilization command, having the two suspects exit the car at the same time, and abandoning a covered position and advancing into the open.  The district court's reasoning assumed that "the force would have been avoided if [the officer] had approached [the plaintiff] as required by proper police procedure." 775 F.2d at 1352.  The Fifth Circuit rejected this analysis, holding that "[t]he constitutional right to be free from unreasonable seizure has never been equated by the Court with the right to be free from a negligently executed stop or arrest." *Id.* at 1353.  It concluded that, if the plaintiff's movements gave the officer cause to believe that there was a threat of serious physical harm, the officer's use of deadly force was not a constitutional violation.  *Id.* (citation omitted).  "The only fault found against [the officer] was his negligence in creating a situation where the danger of such a mistake would exist.  We hold that no right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." *Id.*

*Young* is significant for two reasons.  First, it is factually similar to the case at hand in that involves an officer who shot at a suspect who appeared to be retrieving something from underneath the seat of a vehicle. *See also Reese*, 926 F.2d at 500.  In *Reese*, the Fifth Circuit held that even though the noise from the police car's sirens might have made it difficult for the plaintiff to hear the officer's command to show his hands, the plaintiff clearly understood the officer's initial order and still reached down in defiance. *Id.*  The fact that the plaintiff was ultimately unarmed was found to be irrelevant, since the officer could not have known this. *Id.* at 501.  Similarly, in *Ontiveros*, the Fifth Circuit found the officer's use of deadly force was reasonable when the plaintiff moved out of the officer's line of sight, behind a door, and his action of reaching for his boot could have reasonably been interpreted as reaching for a weapon. *Ontiveros*, 564 F.3d at 385.

In the instant case, Starks had discovered that Carnaby had a concealed hand gun license, and, during the initial stop, when Starks asked if Carnaby was armed, Carnaby said something unintelligible and drove away.  Starks reported on the police radio during the chase that Carnaby was armed.  All four officers at the scene believed that, when Carnaby exited the vehicle, he was holding a weapon in his hand.  All the officers testified that they believed Carnaby, at that moment, posed an immediate harm to their lives and specifically to Washington's life. Washington and Foster fired their guns in the same moment, and Starks and Termeulen both testified that they would have fired their weapons had not Washington been in their line of fire. It is true that the video shows the vehicle's door closing on Carnaby as Washington rounds the front corner of the vehicle, but this does not mitigate the officer's interpretation of Carnaby's reaching movement.  Plaintiff also contends that when Carnaby exited the vehicle he was obeying the officers' commands to exit the vehicle, but she presents no evidence to support this assertion.  Plaintiff's implication that Foster knew Carnaby was holding a cell phone, not a gun, is similarly not supported by any evidence.  Foster testified in his deposition that, before he fired, he believed the object in Carnaby's hand was a pistol.  Under these circumstances, it was reasonable for Foster and Washington to use deadly force.

Second, *Young* is significant because it stands for the proposition that, even if police create a dangerous situation by failing to follow procedure, they are nonetheless justified in shooting a suspect if at the moment of the shooting, deadly force was reasonable. *See Owens v. City of Austin*, 259 Fed. Appx. 621, 624 n. 2 (5th Cir. 2007) (citing *Young*, 775 F.2d at 1353); *Ramirez*, 542 F.3d at 130; *Fraire v. City of Arlington*, 957 F.2d 1268, 1275-1276 (5th Cir. 1992). In *Ramirez*, the Fifth Circuit held that the officer's excessive use of force was unreasonable even though the officers, who shot the suspect when he exited a vehicle holding a gun in both hands,

failed to consider the use of non-lethal force or wait for a hostage negotiator to arrive at the scene. "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it." *Ramirez*, 542 F.3d at 130 (citing *U.S. v. Sharpe*, 470 U.S. 675, 686-687 (1985)). "Even where an officer acts negligently and contrary to police procedure, this court has failed to recognize a constitutional claim where a police officer used deadly force in response to a reasonable believe that an individual posed a threat of serious harm." *Id*.

In the instant case, Plaintiff's criticisms of Foster and Washington's deviation from police procedure do not support an excessive force claim. Both Clark and IAD found that the officers violated procedure by approaching the vehicle instead of maintaining a position of advantage. Clark furthered criticized the officers' failure to turn off the police car's sirens, and Plaintiff argues that the officers did not use the loud speakers on their patrol cars to communicate with Carnaby. While the Court agrees with Plaintiff, Clark, and the IAD that the officers should have used sounder methods in approaching Carnaby's car and communicating with him, it holds that, in the moment he exited his vehicle with the object in his hand, Foster and Washington's use of deadly force was reasonable.

### 3.  Denial of Medical Treatment

The Court must now consider whether Plaintiff has alleged a violation to a clearly established constitutional right to medical treatment. Plaintiff claims that Foster and Washington violated Carnaby's rights by refusing him medical attention after he was shot. Pre-trial detainees have a right to medical care and safety pursuant to the procedural and substantive due process guarantees of the Fourteenth Amendment. *Jacobs v. West Feliciana Sheriff's Department*, 228 F.3d 388, 393 (5th Cir. 2000). "It is well-settled in the law that 'a state official's episodic act or

omission violates a pretrial detainee's due process rights to medical care [and protection from harm] if the official acts with subjective deliberate indifference to the detainee's rights.'" *Id.*

In order to be liable for a violation of a detainee's clearly established constitutional right to medical care, the official must have had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk. *Id.* at 394 (citing *Hare v. City of Cornith*, 75 F.3d 633, 650 (5th Cir. 1996) (en banc) ("*Hare* II")). Thus, the Fifth Circuit requires that defendants be held to a standard of subjective deliberate indifference in determining whether their conduct was objectively reasonable. *Id.* (citing *Hare v. City of Cornith*, 135 F.3d 320, 327 (5th Cir. 1998) ("*Hare* III")). The correct standard is not whether the official "knew or should have known" but whether he had actual knowledge of the substantial risk of serious harm and responded with deliberate indifference. *Matis v. Joseph*, Nos. 05-2615 and 06-0534, 2007 WL 183069, at * 3 (E.D.La. Jan. 17, 2007). Immunity is available even where the acts of the officials constitute gross negligence. *Id.* (citing *Hare* II, 75 F.3d at 645). "Deliberate indifference in the context of an episodic failure to provide reasonable medical care to a pretrial detainee means that: 1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; 2) the official actually drew that inference; and 3) the official's response indicates the official subjectively intended that harm occur." *Thompson*, 245 F.3d at 458-459 (5th Cir. 2001) (citing *Hare* I, 75 F.3d at 649-650). The determination of the objective reasonableness of particular conduct in light of the subjective deliberate indifference standard is a question of law for the court. *Id.* (citations omitted). The Fifth Circuit has attempted to clarify this standard by explaining that "[the court] is to determine whether, in light of the facts as viewed in the light most favorable to the plaintiffs, the conduct of

the individual defendants was objectively unreasonable when applied against the deliberate indifference standard." *Jacobs*, 288 F.3d at 395.

Foster and Washington argue that there is no evidence in the record that they were trained medical technicians or that they had any particular medical expertise which would render them capable of providing medical assistance to a person wounded by a gunshot. Instead, they argue that the uncontroverted evidence is that emergency medical personnel were called to the scene immediately. Foster and Washington argue that, as a matter of law, transporting a wounded suspect to a medical facility is sufficient to defeat a claim for failure to provide medical care. Plaintiff does not directly address these arguments in her Response.

The video from Foster's patrol car indicates that Carnaby exited his vehicle and fell to the ground at 10:35:14. (Pl. Resp., Ex. 30.) The officers then approach Carnaby with handcuffs and crouch around him. At 10:36:23, Starks asks if there is an ambulance en route, and the other officers respond "yes." (*Id.*) The ambulance arrived at 10:48:24. (*Id.*) The evidence does not indicate that Foster or Washington were deliberately indifferent to plaintiff's medical needs. An ambulance was promptly called after the shooting, and while it took over ten minutes to reach the scene, Plaintiff offers no evidence indicating that Foster or Washington deliberately delayed its arrival. *See Mace*, 333 F.3d at 626 (holding that officers who called ambulance to scene did not deny the plaintiff medical care even though the ambulance was delayed by police chief's decision to have an officer drive the ambulance to the emergency room). The Court will therefore grant Foster and Washington's Motion as to Plaintiff's medical treatment claim.

### C. Conspiracy

To establish conspiracy under 42 U.S.C. § 1983, "a plaintiff must show that the defendants agreed to commit an illegal act" and "mere conclusory allegations of conspiracy

cannot, absent reference to material facts" constitute grounds for § 1983 relief. *Dayse v. Schuldt*, 894 F.2d 170, 173 (5th Cir. 1990) (quoting *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982)). Plaintiff offers no evidence in her Response that Foster and Washington engaged in a conspiracy, rather than the conclusory statement that "[b]oth officers clearly performed acts and omissions which led to [Carnaby's] death by excessive force by state actors." (Pl. Response at 7.) This statement is insufficient to maintain a conspiracy claim pursuant to § 1983.

## III.  CONCLUSION

For these reasons, the Court holds that Plaintiff's Motion to Supplement is **GRANTED** and Foster and Washington's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED**.

SIGNED at Houston, Texas, on this the 26th day of August, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS
ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY
AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN
SENT ONE BY THE COURT.**