UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SUSAN CARNABY, INDIVIDUALLY and as REPRESENTATIVE OF THE ESTATE OF ROLAND CARNABY, DECEASED, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF HOUSTON, CHARLES FOSTER, AND ANDREW J. WASHINGTON, <br><br> Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§  CIVIL ACTION NO. 4:08-cv-1366 |

## MEMORANDUM AND ORDER

Before the Court are Plaintiff's Motion for Reconsideration (Doc. No. 136), Defendant City of Houston's ("Houston") Motion for Summary Judgment (Doc. No. 74), and Plaintiff's Supplemental Response (Doc. No. 134). After considering the arguments made in briefing and the relevant law, the Court finds that Plaintiff's Motion for Reconsideration should be denied, and Defendant's Motion for Summary Judgment should be granted.

## I.    PROCEDURAL BACKGROUND

The Court has described the facts of Carnaby's shooting in its previous Memorandum and Order on Defendants Foster and Washington's Motion for Summary Judgment. (Doc. No. 131.) Plaintiff challenges that Order, which granted summary judgment for Officers Foster and Washington, in her Motion for Reconsideration. In her Motion, Plaintiff argues that *Young v. City of Killeen*, 775 F.2d 1349 (5th Cir. 1985), relied on by the Court in its Order, is distinguishable because it involved a negligent seizure. She also argues that Officer Foster's deadly force was not objectively reasonable in light of the available video evidence.

1

Plaintiff also asserted claims against Houston.  Because Plaintiff did not receive certain IAD reports requested in discovery until after the Motions for Summary Judgment had been briefed, the Court granted Plaintiff leave to file a Supplemental Response to the City's Motion. Plaintiff argues that Houston violated Carnaby's Fourth Amendment rights because of its custom, policy and practice of not disciplining or retraining officers who use excessive force on suspects, or who violate chase policies or other policies regarding the safe apprehension of suspects in vehicles.  Plaintiff also argues that Houston ratified Foster and Washington's alleged bad acts by failing to discipline or retrain the officers after the shooting.  Finally, Plaintiff avers that Houston is liable for Carnaby's injuries pursuant to the Texas Tort Claims Act ("TTCA").

## II.   MOTION FOR RECONSIDERATION ANALYSIS

### A. Motion for Reconsideration Standard

A motion for reconsideration may be made under either Federal Rule of Civil Procedure 59(e) or 60(b).[1]  *Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328 n.1 (5th Cir. 2004). Such a motion must "clearly establish either a manifest error of law or fact or must present newly discovered evidence.  These motions cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005) (citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)).  In considering a motion for reconsideration, a court "must strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993).

---

[1] While the Federal Rules of Civil Procedure do not provide for a motion for reconsideration, such a motion may be considered either a Rule 59(e) motion to alter or amend judgment or a Rule 60(b) motion for relief from judgment or order. *Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n.10 (5th Cir. 1998). If the motion is filed within ten days of the judgment or order of which the party complains, it is considered a Rule 59(e) motion; otherwise, it is treated as a Rule 60(b) motion. *Id.* (internal citations omitted). Because plaintiffs' motion for reconsideration was filed more than ten days after the district court's order dismissing the suit, it is treated as a Rule 60(b) motion.

## B. Applicability of *Young v. City of Killeen*

Plaintiff's argument is that *Young v. Killeen* is factually distinguishable because that case involved mere negligent behavior, and this case involves more. The Court finds Plaintiff's position unavailing. The facts in this case track *Young* so closely that the case serves as binding precedent for this Court. In the instant case, Carnaby stopped and was surrounded by officers after attempting to flee by car. The officers left their position of cover and gave repeated commands for Carnaby to exit his vehicle. When he began to do so and reached quickly under the seat of his car, Officers Foster and Washington fired their weapons. The two officers were later found to have violated Houston Police Department procedure as to high-risk vehicle approaches and supervisory behavior. (*See* Doc. No. 131, p. 8.)

In *Young*, a police officer initiated a stop of two suspects, who then attempted to flee by car. The officer blocked the car with his own patrol vehicle. He then left his vehicle and ordered the two suspects to exit their car. The driver reached under the seat of his car, and the police officer, believing that the driver had a gun, fired his weapon and fatally wounded the driver. *Young*, 775 F.2d at 1351. The district court judge found that the officer had violated fully six police procedures in his apprehension of the suspects: the officer failed to use his radio, failed to utilize a back-up unit, parked his patrol car dangerously, failed to issue an immobilization command, ordered the two suspects to exit simultaneously, and abandoned a covered position. *Id.* The district court judge found that the breach of these six different police procedures, taken together, were the but-for cause of the suspect's death. Despite that finding, the Fifth Circuit still characterized the incident as a "negligent taking of life" that did not amount to a constitutional deprivation. *Id.* at 1353. The Fifth Circuit subsequently applied and explained this holding in *Fraire v. City of Arlington*, 957 F.2d 1268, 1275 (5th Cir. 1992). In *Fraire*, the court again

3

rejected the argument that a police officer was liable where he may have "manufactured the circumstances that gave rise to the fatal shooting." *Id.* at 1275. The court explained that *Young* stood for the proposition that "regardless of what [] transpired up until the shooting itself, [if the suspect's] movements [give] the officer reason to believe, at that moment, that there was a threat of physical harm," the officer acts reasonably, and not unconstitutionally, in using deadly force to protect herself or others. *Id.* at 1276; *see also Ramirez v. Knoulton*, 542 F.3d 124, 130 (5th Cir. 2008); *Owens v. City of Austin*, 259 Fed. Appx. 621, 624 n.2 (5th Cir. 2007).

The Court simply cannot ignore factual similarities at this level of detail. Given the well-settled law of this Circuit, the Court finds that the officers' reasonably feared for their lives at the moment they shot Carnaby, and thus, that no constitutional deprivation occurred. *See Young*, 775 F.2d at 1353. This holds even if the officers' actions leading up to the shooting were the but-for cause of Carnaby's death. *Id.*; *see also Fraire*, 957 F.2d at 1276.

The Court rejects Plaintiff's attempt to distinguish *Young* and the subsequent line of Fifth Circuit cases by characterizing the sets of facts involved there as mere negligence. First, as noted above, those cases make clear that breaches of police procedure establish negligent behavior in executing a stop, a finding that is directly applicable to this case. Second, the cases Plaintiff cites, some of which do stand for the proposition that an officer may not claim qualified immunity where her legitimate fear arose from her own improper use of power, are too factually dissimilar to provide the Court with a basis for disavowing *Young* and its progeny. In *Gilmere v. City of Atlanta*, for example, a defendant was attempting to escape unjustified physical beatings by officers when he was shot. 774 F.2d 1495, 1501-02 (11th Cir. 1985), *abrogated on other grounds by Nolin v. Isbell*, 207 F.3d 1253, 1255-57 (11th Cir. 2000). In *Starks v. Enyart*, the case turned on whether the officer jumped in front of the suspect's vehicle so suddenly that the

4

suspect was unable to react and avoid presenting a deadly threat to the officer. 5 F.3d 230, 234 (7th Cir. 1993). And to the extent that the cases cited by Plaintiff support the proposition that an officer's unreasonable actions prior to a shooting preclude a finding of qualified immunity, *see Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991), that is not the rule in this Circuit and the Court may not adopt that rule in this case.

This Court finds no analogous set of facts in cases cited by Plaintiff that would allow it to depart from settled Fifth Circuit law in favor of tenuous, nonbinding precedent. In this case, the officers' actions did not induce or force a reaction, as Plaintiff asserts. Carnaby was not physically dragged out of the car, subject to physical beatings, or coerced to leave the car. After repeated warnings, the officers did break the window, and Carnaby voluntarily acted in exiting the car after that. His reaching under the seat as he exited the car was in no way induced by the officers, and it was that motion, clearly visible on the videotape, that led the officers to fear reasonably for their own safety.

### C. The Objective Reasonableness of Foster's Deadly Force

Next, Plaintiff asserts a number of alleged factual differences between the officers' testimony and the video evidence available. She argues that a jury should resolve these factual disputes. Among the differences alleged by Plaintiff include whether Carnaby had his hands out as he exited the vehicle; whether he was looking down or at Washington; whether Foster saw a shiny object in Carnaby's hands; what orders were being given to Carnaby; whether he was reaching frantically between the seats; whether breaking the window would cause him to make a wrong move; and whether Foster should have known that he was holding a cell phone and not a weapon.

Plaintiff cites the recent Supreme Court decision, *Scott v. Harris*, 550 U.S. 372 (2007), in urging the Court to view the facts depicted in the videotape.  In *Scott v. Harris*, the Supreme Court reversed an Eleventh Circuit decision that adopted the plaintiff's sanitized version of a police car chase for the purposes of summary judgment.  This version directly contradicted the video evidence in the record.  In reversing the Eleventh Circuit, the Court stated that when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.* at 380.

In viewing the videotape, as Carnaby exits the vehicle, he crouches down and reaches underneath the seat.  He then stands up straight and steps away from the vehicle with his hands out, before the door hits him and the officers discharge their weapons.   (Doc. No. 114, Ex. 31.) No reasonable jury could find that the officers did not reasonably fear for their lives given Carnaby's actions in that moment.  Though there might be other factual disputes, such as in what direction Carnaby was looking as he exited the vehicle or what commands he was being given, the video clearly depicts Carnaby reaching under the seat just after opening the door to his vehicle.  That is the moment at which the officers were justified in applying deadly force, and that determination renders other factual questions moot.  As long as it is clear that an officer reasonably feared that her life was in danger in the moment that she used deadly force against a suspect, no constitutional violation has occurred.  *Fraire*, 957 F.2d at 1276.

## III.     SUMMARY JUDGMENT ANALYSIS

### A. Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on

the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th

Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could

enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899,

902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving

party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory

allegations, unsubstantiated assertions, and unsupported speculation are not competent summary

judgment evidence. F.R.C.P. 56(e)(1); s*ee, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th

Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *see also Little v. Liquid Air

Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied

with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co.,

Ltd. v. Zenith Radio Corp.*, 475 U.S. 575, 586 (1986)).

### B. Section 1983 Claims

Section 1983 provides injured plaintiffs with a cause of action when they have been

deprived of federal rights under color of state law. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d

211, 215 (5th Cir. 1998). The statute reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of
> any State or Territory or the District of Columbia, subjects or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983. In order to state a cause of action under § 1983, a plaintiff must (1) allege a

violation of rights secured by the constitution or laws of the United States and (2) demonstrate

7

that the alleged deprivation was committed by a person [or entity] acting under color of state law. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d at 215.

### 1. Fourth Amendment Claim

The Supreme Court held in *Monell v. Department of Social Services* that municipalities are "persons" subject to suit under 42 U.S.C. § 1983. 436 U.S. 658, 663 (1978). A municipality is liable under Section 1983 if three requirements are met. First, the municipality must have "an official policy, practice, or custom" which could subject it to Section 1983 liability. *Monell*, 436 U.S. at 690-94. Second, the official policy must be linked to the constitutional violation. *Id.* Finally, the official policy must reflect the municipality's deliberate indifference to the plaintiff's injury. *Lawson v. Dallas County*, 286 F.3d 257, 263 (5th Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)). Municipalities are not liable on a respondeat superior basis; that is, a municipality cannot be held liable simply by virtue of the fact that one of its employees violated a person's federal rights. *Monell*, 436 U.S. at 691. The municipality itself must cause the violation through its policies. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under [Section] 1983." *Id.* at 694.

An "official policy" for Section 1983 purposes may be either a written policy or a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Deville v. Marcantel*, 567 F.3d 156, 171 (5th Cir. 2009) (quoting *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (en banc)). "That is, the existence of a persistent pattern of illegal conduct, tolerated by municipal

8

policymakers, tends to show that the subject conduct does not represent an unauthorized

departure from lawful policy but instead represents the realization of an *unlawful* policy." *Milam*

*v. City of San Antonio*, 113 Fed. Appx. 622, 625 (5th Cir. 2004) (not designated for publication)

(emphasis by *Milam* court). It is not enough that an illegal custom exists; municipal

policymakers, who are the persons capable of subjecting a municipality to liability, must be

chargeable with awareness of the custom. *Id.* at 625 n.2 (citing *Pineda v. City of Houston*, 291

F.3d 325, 330-31 (5th Cir. 2002)).

In *City of Canton v. Harris*, a case specifically involving the training of police officers,

the Supreme Court held that a municipality can be liable under Section 1983 for failing to train

its employees. 489 U.S. 378, 387 (1989). "Only where a failure to train reflects a 'deliberate' or

'conscious' choice by a municipality . . . can a city be liable for such a failure under [Section]

1983." *Goodman v. Harris County*, 571 F.3d 388, 396 (5th Cir. 2009) (citing *Harris*, 489 U.S. at

389). The Fifth Circuit has extended *Harris* to cover a plaintiff's allegations that the

municipality failed to properly discipline its employees. *Deville*, 567 F.3d at 171 (citing

*Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001) ("Self-evidently, a City policy

of inadequate officer discipline could be unconstitutional if it was pursued with deliberate

indifference toward the constitutional rights of citizens.")).

Houston argues, in its Reply, that Plaintiff has failed to establish that a constitutional

violation occurred or that Houston provided inadequate police training. Houston argues that,

since the Court found in an earlier order that Foster and Washington had not committed a

constitutional violation when they shot Carnaby, there can be no municipal liability. As to

Plaintiff's training claims, Houston points out that the Court struck the proffered expert

testimony of Roger Clark as to the adequacy of the Houston Police Department's ("HPD")

9

training programs or whether its programs satisfy TCLEOSE standards. Houston argues that, without Clark's testimony, Plaintiff makes only conclusory allegations about the adequacy of the training.

Plaintiff, in her Surreply, contends that Houston ignores her claims that it had an unconstitutional pattern or practice, custom, and written policy. Plaintiff argues that, in order to grant an officer qualified immunity, a court is not required to find that no constitutional violation occurred. Further, Plaintiff claims that the case law suggests that a defendant municipality is not saved from liability when an individual officer is found to be immune from suit. Plaintiff also points out that she has filed a Motion to Reconsider the Court's Memorandum and Order granting summary judgment to Foster and Washington. Plaintiff further argues that, in the instant case, Houston contributed to Carnaby's death through its faulty administration of Policy 600-34. Finally, Plaintiff points out that the Court only struck Clark's testimony as it relates to HPD's training policies and the TCLEOSE standards, not his analysis of Houston's written policies or its officers' practices of approaching vehicles during felony stops, failing to give coherent commands, and breaking in windows.

### 1. Houston's Liability Absent an Unconstitutional Act

In support of its argument that it cannot be held liable unless Foster or Washington violated Carnaby's constitutional rights, Houston cites *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Plaintiff argues that *Heller* is distinguishable because, in the instant case, Houston caused the situation whereby Foster and Washington felt that they had a reasonable fear for their lives. Plaintiff points out that, in *Heller*, the plaintiffs did demonstrate that the municipalities' officers had previously shot unarmed suspects because of their faulty high risk vehicle approach tactics. Plaintiff concludes that, even though Houston knew about these

previous shootings and publicly admitted that officers should be trained differently, it still failed

to change its practices, training, or written policy.

  While it is true that the Supreme Court does not discuss any facts indicating that the City

of Los Angeles had historically failed to punish its officers for use of excessive force, the

plaintiff in *Heller* did argue that the City of Los Angeles created the situation that allowed the

officers to use excessive force.  The plaintiff argued that the jury could have found that the

officers relied in good faith on the City of Los Angeles policies, which were in fact

unconstitutional.  The Supreme Court rejected this reasoning, arguing that the jury in *Heller* had

found that the officer did not violate either the plaintiff's Fourth or Fourteenth Amendment

rights.  It then noted that "if the latter inflicted no constitutional injury on respondent, it is

inconceivable that [the City] could be liable to respondent." *Heller*, 475 U.S. at 799.  The

Supreme Court concluded:

> [N]either [*Monell*], nor any other of our cases authorizes the award of damages against a
> municipal corporation based on the actions of one of its officers when in fact the jury has
> concluded that the officer inflicted no constitutional harm.  If a person has suffered no
> constitutional injury at the hands of the individual police officer, the fact that the
> departmental regulations might have *authorized* the use of constitutionally excessive
> force is quite beside the point.

*Id.*

  In the case Plaintiff cites, *Trigalet v. City of Tulsa*, the Tenth Circuit, relying on *Heller*,

held that a municipality cannot be held liable for its employee's actions if those actions did not

constitute a violation of the plaintiff's constitutional rights.  239 F.3d 1150, 1154 (10th Cir.

2001).  The facts in *Trigalet* were slightly different than those before the Court—the plaintiffs

were the personal representatives of people killed by a car being pursued by the Tulsa police.

The plaintiffs brought claims against the individual officers and Tulsa, alleging that its training

and supervision of its officers during high speed chases was unconstitutional.  The Tenth Circuit,

citing cases from the First, Fourth, Sixth, Seventh, Eighth, Ninth, and Eleventh circuits, held that, even if Tulsa's policies, training, and supervision were unconstitutional, it could not be held liable if the individual officers did not commit a constitutional violation.[2]

The Fifth Circuit has similarly held that a municipality is not liable when its employee did not commit a constitutional violation. *See Alpha v. Hooper*, 440 F.3d 670, 672 (5th Cir. 2006) (upholding summary judgment for the defendant county because the defendant officer, who shot and killed the plaintiff, did not use excessive force); *Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003) (same); *Thomas v. Murray*, 251 F.3d 156 (5th Cir. 2001) (holding that, because defendant police officer did not use excessive force or unlawfully detain the plaintiff, the defendant county was entitled to summary judgment on plaintiff's ratification claim). In *Rios v. City of Del Rio*, the case cited by Houston, the Fifth Circuit upheld the dismissal of the plaintiff's claims against the defendant police chief who had supervised the defendant officer. 444 F.3d 417 (5th Cir. 2006). The plaintiff, a border guard who had been struck by a prisoner driving a stolen police car, asserted that the officer had violated his Fourteenth Amendment right to be free from state deprivation of his bodily integrity liberty interest. The Fifth Circuit found that no such violation occurred. Turning to the plaintiff's claims against the police chief, it stated that "[a] plaintiff must show either the supervisor personally was involved in the constitutional violation or that there is a sufficient causal

---

[2] *Trigalet* acknowledged that a Third Circuit panel had held that, when a plaintiff alleges a Section 1983 claim based on the violation of her substantive due process rights, a municipality can be found liable regardless of whether an individual officer violated the plaintiff's constitutional rights. *Fagan v. City of Vineland*, 22 F.3d 1283 (3d Cir. 1994). The *Fagan* panel specifically distinguished *Heller*, pointing out that it was based on a Fourth Amendment excessive force claim. It is unclear from Plaintiff's Complaint whether she intends to allege a separate substantive due process claim against Houston; regardless, the Fifth Circuit, along with the First and Fourth Circuits, have rejected the *Fagan* court's holding that a municipality can be held liable for substantive due process violations even if its employees did not commit a constitutional violation. *See Saenz v. Heldenfels Bros.*, 183 F.3d 389, 392-93 (5th Cir. 1999); *Young v. City of Mount Rainier*, 238 F.3d 567, 579 n.9 (4th Cir. 2001); *Evans v. Avery*, 100 F.3d 1033, 1039 (1st Cir. 1996). *But see Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005); *Gibson v. City of Washoe*, 290 F.3d 1175 (9th Cir. 2002).

connection between the supervisor's conduct and the constitutional violation." *Rios*, 444 F.3d at 425 (quoting *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003)).[3] "It is facially evident that this test cannot be met if there is no underlying constitutional violation." *Id.* (citing *Breaux v. City of Garland*, 205 F.3d 150, 161 (5th Cir. 2000)). The *Rios* court also noted that, in *Collins v. City of Harker Heights*, the Supreme Court stated that "*if* a city employee violates another's constitutional rights, the city may be liable *if* it had a policy or custom of failing to train its employees and that failure to train caused *the constitutional violation*." *Id.* at 426 n. 11 (citing *Collins v. City of Harker Heights*, 503 U.S. 115, (1992) (emphasis added by the *Rios* court). Because the Court has already found that Foster and Washington's use of force was reasonable, and therefore not in violation of the Fourth Amendment, it follows that Houston is also not liable for the use of force or its failure to properly train the officers.

### 2. Merits of Plaintiff's Claims Against Houston

If the Court were to consider the merits of Plaintiff's *Monell* claims, it would still find that Houston is entitled to summary judgment. Plaintiff first argues that the testimony of Foster and Washington demonstrates the inadequacy of HPD's training for excessive force and high speed vehicle approaches. In his deposition, Foster, who has been with HPD for fifteen years and has received all of his training through the Houston Police Academy ("the Academy"), testified that he did not believe his training was adequate for the situation he encountered with Carnaby. (Foster Dep. 5:15-17; 23:11-13; 25:1-3.) Foster has been involved in between five and ten high speed chases throughout his career. (Foster Dep. 45:21-25.) Since Foster finished his initial training at the Academy, he completed one class on high risk vehicle approaches about a year before his encounter with Carnaby. (Foster Dep. 24:1-4.) At that training, Foster watched a

---

[3] The standard used to assess supervisor liability under Section 1983 is the same as that used to assess municipal liability. *Rios*, 444 F.3d at 426 (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) (en banc)).

presentation with other officers, which included a slide show. The officers then did a practical training inside a classroom where they put four chairs together to represent a car and the officers practiced the procedures for a felony stop. (Foster Dep. 24:16-21.) He has not had "shoot/don't shoot" training since his initial training at the Academy. (Foster. Dep. 66:8-18.) Since the accident, he has not had additional high risk vehicle approach training or any classes or policy reviews. (Foster Dep. 84:11-13; 85:1-5.) Washington, who has been a police officer for twenty-three years and a supervisor for eleven years, went through a similar high risk vehicle approach training using chairs to represent a car and rubber guns. (Washington Dep. 5:10-11; 9:7; 20:9-14; 21:17-22.) He did not have any training outside using a car. (Washington Dep. 20:19-21.)

The summary judgment record also included testimony from Jim Dozier, Former Executive Director of Texas Commission on Law Enforcement. (Doc. No. 76, Ex. F.) Dozier, who served as the Executive Director from 1994 to 2005, and who is currently an associate professor at the Sam Houston State University College of Criminal Justice, asserts that the training given to HPD officers "meets and in most cases exceeds requirements set forth by TCLEOSE for the State of Texas Commission on Law Enforcement Standards and Training." Dozier's testimony is confirmed by that of Terry Bratton, a senior HPD officer and a member of the HPD Training Academy. (*Id.* Ex. G.) Bratton, who is TCLEOSE certified as an officer and instructor, testified that the training at the Academy meets or exceeds the training requirements of TCLEOSE. Officers are trained by Harris County ADAs on when the use of deadly force is appropriate. According to Bratton, officers also have a specific block of training on high risk vehicle approaches, which includes a simulation of methods called "Field Problems." HPD's Officer Training for 2004 included specific training on High Risk Vehicle Approaches, which was mandatory for all classified officers. Both Foster and Washington completed this training.

14

Finally, Michael Dirden, the Assistant Chief in charge of Criminal Investigations Command,

testified that "[B]oth Sgt. Washington and Officer Foster expressed an interest in more training

in the area of approaching high risk vehicles. It is safe to say that essentially every law

enforcement agency wishes it had the resources to conduct more training. The reality is that a

balance must be struck between the time devoted to training and the time required for officers to

meet their primary missions whether it be responding to Calls for Service in a patrol assignment

or investigating cases in what is commonly referred to as the role of a detective." (*Id.* Ex. H.) He

also testified that both Foster and Washington had received remedial training under General

Order 600-34.

Plaintiff has not presented any evidence contradicting Houston's claim that its officers

receive TCLEOSE compliant training.[4] *See Wassum v. City of Bellaire*, 861 F.2d 453, 456 (5th

Cir. 1988) (concluding that, when city's hiring standards were nearly compliant with TCLEOSE

standards, to hold the city liable would "march too far down a path toward liability based on

simple negligence").

Plaintiff has also offered a series of IAD reports which she alleges demonstrate

Houston's pattern or practice of allowing officers to violate Policy 600-34, leading to the

shooting of unarmed suspects. The Court briefly discusses each of these incidents:

**Officer A.M. Ruggeroli**

The IAD Event Report and HPD Witness Statements indicate that, in October 1998,

Ruggeroli observed what appeared to be a stolen vehicle traveling in central Houston. Ruggeroli

alerted the HPD dispatcher and waited for back up to arrive. When he was joined by Officer

B.T. Mitchell, Ruggeroli and Mitchell activated their sirens and Ruggeroli initiated a felony

traffic stop. The suspect, who was driving the vehicle, led the officers on a brief chase; there

---

[4] As mentioned above, the Court struck Roger Clark's proffered expert testimony on these subjects.

was also a passenger in the front seat. When the vehicle came to a stop, both Ruggeroli and

Mitchell approached the driver's side of the vehicle and Ruggeroli repeatedly gave verbal

commands for the driver to put his hands in the air. The suspect did not comply, and Officer

Mitchell observed him making movements in the floorboard area of the vehicle. Mitchell became

concerned for their safety because he believed the suspect was reaching for a weapon. Ruggeroli

then fired his weapon one time. The spent round traveled through the driver's side window

through the front windshield, and driver sustained injury to his left ear from flying glass.

Mitchell ran to the passenger side of the vehicle, tried to open the passenger side door, but

finding it locked, he broke in the window with his flashlight, reached inside and pulled the

passenger out of the car. Both the driver and the passenger were then placed in custody. (Doc.

No. 134, Ex. 40.)

      HPD found that Ruggeroli's discharge of his firearm was intentional but not justified, and

it sustained the second allegation regarding the use of deadly force. (Doc. No. 134, Ex. 39.) The

recommended discipline was a five day suspension. The record does not indicate whether

Officer Mitchell was disciplined.

**Sergeant M.W. Glover and Officer J.D. Shockley**

      The next incident occurred on June 18, 1999. Officer Shockley attempted to make a

felony traffic stop of two aggravated robbery suspects as they prepared to rob a bank located

inside a grocery store. The two suspects became uneasy and left the store without attempting the

robbery. As they exited the parking lot, Lieutenant Webber contacted Sergeant Glover to assist

with the felony stop. Glover pulled in behind the suspects, who were blocked by traffic, and

activated his flashing lights and police siren. Webber pulled up to the right side of the vehicle

and stopped ahead of it, blocking their path with his left rear bumper. Shockley parked behind

Glover's patrol car. Each officer left his patrol car and approached the suspect's vehicle with his weapon drawn. Webber approached the front of the suspect's vehicle, using his own patrol car for coverage. Glover approached from the rear driver's side. Shockley, who was armed with a shotgun, approached from the rear passenger side. All the officers gave verbal commands indicating that they were police officers and demanded that the suspects surrender. The driver drove into Webber's rear bumper in an attempt to escape.

The traffic cleared and the driver turned to the left and sideswiped Webber's vehicle. At the same time, the passenger in the vehicle's front seat made a sudden move which the officers interpreted as reaching for a weapon. Glover made an attempt to eliminate the perceived threat by breaking the driver's side rear window with the butt of his weapon. His weapon accidentally discharged and shot the driver in the shoulder. Shockley thought shots were being exchanged with the suspects and believed that, as the suspects accelerated, Webber was in danger of being hit by their vehicle. He fired one shot at the rear of their vehicle. The suspect's vehicle continued for another couple of blocks until it stopped, at which time the passenger ran from the car. The passenger was later found and arrested, and the driver died from the wounds to his shoulder. (Doc. No. 134, Ex. 41.)

The IAD investigation found that the shooting was accidental and Glover was not disciplined. (Doc. No. 134, Ex. 41.) Shockley's shooting was deemed intentional and justified. *Id.* The IAD report noted that there was a possible issue as to whether Glover violated Policy 600-34, but that a review of the facts showed that he had tried to establish verbal communication with the suspects while maintaining a position of advantage. The Report found that, pursuant to Policy 600-34, if a suspect does not comply with verbal commands, the officer must use his own discretion as to whether to make the apprehension in accordance with existing departmental

procedures. The report found that, although Glover would have been authorized to use deadly force, he instead tried to end the eminent danger by breaking the window.

**Officer R.C. Headley**

Headley observed a van driving without its lights on and stopped it on July 26, 2000. Both passengers in the vehicle informed Headley that they did not have identification, and when she ran the license plate number in her patrol car, she discovered that the vehicle had been stolen. While Headley was waiting for back up to arrive, the passenger exited the vehicle and walked towards Headley's patrol car. She stepped out of her patrol car, drew her weapon, and ordered him back into the van. He complied. Shortly afterwards, both the driver and the passenger exited the vehicle and approached the patrol car. Headley ordered both individuals to get back in the van, but they refused. The driver turned his back to Officer Headley and concealed his hands near his waistband. He then made a sudden turn towards Officer Headley, and she discharged her weapon one time, hitting the driver in the buttocks. The passenger ran in front of the van and crouched down. Headley ordered him to return to the van, but he refused. The passenger then jumped up, with his hands concealed, and Headley fired a second shot, hitting the passenger in the shoulder. The passenger was later apprehended.

The driver disputed Headley's account, stating that she ordered him out of the van, and that when he exited the van with his back to the officer, he closed the van door with both hands before Headley shot him. IAD found that the shooting was intentional and justified. (Doc. No. 134, Ex. 42.) The report found that the driver and passenger were in a stolen vehicle and refused Headley's orders to stay in the van, and that when they exited the vehicle they concealed their hands from her.

**Officer R.A. Williams**

18

On August 28, 1999, Officer Williams was working an approved extra job in full uniform at the Roxy Club. He observed a car traveling with two passengers outside of the Roxy Club. When Williams signaled for the car to stop and asked the passengers for identification, they fled, hitting Williams with the car. Williams jumped into his vehicle and followed the car, which stopped at a traffic light a few minutes later. Williams ordered the driver to exit the vehicle and lay on the ground. The driver did so, but as Williams backed up, the driver jumped back into the car. Williams ran to the front of the car and yelled for the driver to stop and not move, but the driver accelerated the car. As the car came toward him, Williams fired his weapon three times. IAD found that the shooting was intentional and justified. (Doc. No. 134, Ex. 44.)

**Officer B. Thompson**

On June 9, 2005, Officer Thompson was returning from a robbery call when he saw a car speeding. He stopped the vehicle and thought that the driver of the vehicle might be connected somehow to the robbery call. Using his emergency equipment, Thompson attempted to initiate a traffic stop but the driver refused to stop the vehicle. When the car finally stopped after approximately one quarter mile, Thompson ordered the driver to remain in the car and put his hands outside the window. The driver could be seen moving in the car, but he finally complied and Thompson approached the vehicle. The driver then began exiting the vehicle and Thompson ordered him not to get out. The driver then turned back into the car and began reaching for something in the car as if to get something. Thompson ordered him several times to stop and not move, but the driver did not comply. He then began turning towards Thompson with the hand that had been reaching inside the car, and Thompson fired once. The driver disputed the officer's version of events, stating that the officer ordered him to get out of the car. There were

seven witnesses to the shooting, all of whom support the officer's version of events.  IAD

concluded that the shooting was intentional and justified.  (Doc. No. 134, Ex. 45.)

**Officer R.G. Gardiner**

On March 15, 2006, Officer Gardiner observed a vehicle traveling down the road and ran

a check on the vehicle's license's plates.  He discovered that the vehicle was stolen.  The

vehicle's driver pulled into a gas station and went inside the store.  While Gardiner was waiting

for back up, he observed the suspect return from the store and open the vehicle's hood.  The

driver began working on the vehicle from the passenger side.  Gardiner decided to approach the

driver while he still had a visual on him.  He pulled into the gas station parking lot and parked

about seven feet in front of the stolen vehicle.  Gardiner exited the patrol car and ordered the

suspect to lie down on the ground.  The driver refused to comply and dove headfirst into the

vehicle's front seat.  The driver then appeared to be reaching beneath the car seat and the

passenger side of the floor board area.  Gardiner fired his duty weapon, hitting the suspect four

times.  IAD found that the shooting was intentional and justified.  (Doc. No. 134, Ex. 46.)

**Officer E.D. Hillman**

Officer Hillman, who was also an attorney, was involved in a romantic relationship with

victim's wife.  One week prior to the incident, the victim had come to the police station where

Hillman worked and threatened Hillman.  The next week, on December 15, 2003, when Hillman

and his wife were leaving their residence, the victim drove his vehicle onto Hillman's property

and stopped.  Hillman approached the victim's vehicle with his gun in his left hand and his

police identification in his right hand.  Hillman advised the victim that he was going to arrest him

for trespassing.  The victim leaned over and reached for the glove compartment, telling Hillman

20

"fuck you." Hillman fired a shot into the victim's vehicle, and then as the victim began to back across the driveway, Hillman fired three more shots.

IAD found that Hillman had violated Policy 600-34 and 600-17. The shooting was found to be intentional and not justified. Hillman's IAD file indicates that he retired before he was disciplined, but that the investigation would have resulted in his indefinite suspension. His file also indicates that he not be considered for rehire. (Doc. No. 134, Ex. 47.)

**Sergeant Guzman, and Officers Albrooks, Harding, Wilkins, Manuel, and Tomeo**

Alsbrooks and Cuevas were on routine patrol on October 25, 1998. They observed a truck stop in the middle of the street and pick up a passenger. The truck then failed to use a turn signal in making a turn, and ran a stop sign. Alsbrooks and Cuevas initiated a traffic stop, and the truck sped away. Shortly thereafter, the truck slowed down and the passenger jumped out. Cuevas exited the patrol car and caught the passenger on foot, who told Cuevas that the driver had a gun. The police called for backup on the chase because the driver was believed to be armed. During the chase, the driver intentionally struck another patrol vehicle. Eventually, the driver lost control of his truck, struck the guardrail, and stopped. Alsbrooks, Wilkins, Harding, and Tomeo approached the vehicle. Alsbrooks observed the driver struggling inside the vehicle, reaching to the floorboard and throwing objects outside the driver's window. Guzman, who had also approached the vehicle, observed Harding and Tomeo breaking the truck's windows. The driver failed to obey the officers' commands to exit the vehicle and show his hands. Instead, he jumped to the passenger's side of his vehicle, fended off baton strikes from Officer Harding, and reached out of the window and grabbed Officer Wilkins' gun barrel. He then reached down to the floorboard, came up with an object that looked like the barrel of a gun, and aggressively pointed it at the officers. Alsbrooks and other officers fired his weapon at the driver, scared that

21

the driver was going to begin shooting. The driver died from these gunshot wounds. In all, fifty-three (53) fired casings were recovered from the scene.

IAD found that the discharge of firearms by Guzman, Alsbrooks, Wilkins, Manuel, and Tomeo, among others, was intentional and justified. However, the report concluded that Guzman, Alsbrooks, Harding, Wilkins, Manuel, and Tomeo violated Policy 600-34 by approaching the driver's vehicle while he was still inside after a fresh pursuit. The report also established violations of other HPD policies. Guzman received a six-day suspension; Alsbrooks, Harding, and Wilkins received four-day suspensions; and Manuel and Tomeo received five-day suspensions. (Doc. No. 134, Ex. 49.)

**Officer R.L. Plotner**

On March, 31, 2003, Plotner observed a car leaving a business in Lathrop, Texas. The driver turned off all the vehicle's running lights and Plotner began to follow it. After a brief pursuit, the vehicle ran off the road. Plotner approached the vehicle to check on the vehicle's passengers and observed one passenger trying to climb out of the driver's side window. Plotner observed a gun like object in the passenger's hand, which the passenger pointed at Plotner. The object was actually a radio. Plotner fired twice at the suspect, who died as a result of the incident. IAD found that the shooting was intentional and justified. (Doc. No. 134, Ex. 50.)

**Officer J.L. Rivera**

On October 12, 2003, Rivera observed a vehicle being driven that matched the description of a vehicle that had been stolen earlier in the evening. Rivera followed the vehicle to an apartment complex. Rivera took a position of advantage behind his patrol car and ordered the suspect to exit the vehicle. It appeared to Rivera that the suspect was complying. Rivera failed to follow procedure when he left his position of advantage and placed himself in danger

when he took a few steps forward in order to get a better view of the suspect.  When the suspect reversed the vehicle, Rivera fired three shots at the suspect, who then fled the area and was later apprehended.  Because Rivera had a reasonable belief that the vehicle had earlier been involved in an aggravated robbery and kidnapping in which the suspect was armed, the IAD report found that the shooting was intentional and justified.  The IAD further found, however, that by taking a few steps forward, Rivera violated the High Risk Vehicle Approach policy.  It also found that he had failed to maintain communications with the dispatcher.  (Doc. No. 134, Ex. 51.)

**Officer C. Pena**

On October 5, 2004, Officer Pena was dispatched to a robbery call.  While Pena was interviewing the complainants, the suspects drove past them.  Pena got in his patrol car and began to follow them.  When the two cars reached a dead end street, the driver of the car backed into Pena's patrol car, causing his vehicle to jump the hood of the patrol car.  Pena exited his patrol car and ordered the two suspects to get on the ground, but they began running in opposite directions.  When Pena lost the first suspect, he observed the second suspect running down the street and followed her.  She rounded a corner and hid under a van.  Pena saw the suspect lying under the van with her hand under her body.  He commanded her not to move, and she made a quick motion with her left hand in his direction.  Pena fired his weapon at the suspect and took cover.  The suspect said that was trying to slide out from under the van, with her hands above her head, when Pena shot her.  IAD found that, since the suspect had been engaged in a robbery and violently ramming the police car, Pena's use of force was reasonable and the shooting was intentional and justified.  (Doc. No. 134, Ex. 52.)

**Officers M.W. Hamby and T.D. Butler**

23

On January 26, 2007, Officers Hamby and Butler were conducting a follow-up investigation when they saw the suspect sitting in their city-issued vehicle in a restaurant parking lot. Both officers immediately drew their weapons and gave verbal commands for the suspect to exit the vehicle and get on the ground. The suspect then entered a Chevy Malibu that was parked next to the vehicle and drove the vehicle directly at Officer Butler. Butler shot at the suspect as the vehicle struck him. The vehicle then hit the curb and came to a stop, and Butler and Hamby again ordered the suspect to exit the vehicle and show his hands. The suspect exited the vehicle, refused to get on the ground and went down to his knees or squatted for a moment and then stood back up. The suspect reached under his jacket and Hamby told him numerous times to show his hands and take them away from his clothing. When the suspect continued to reach under his clothes, Butler discharged his weapon. Hamby discharged his weapon earlier, as the vehicle attempted to run them over. IAD found that the discharge of both weapons was intentional and justified. (Doc. No. 134, Ex. 53.)

**Probationary Officer Carraway**

On August 14, 2007, Carraway and Officer W.G. Munoz were on patrol when they saw a vehicle litter. Carraway, who was driving, activated the patrol car's emergency equipment. The vehicle slowed down, stopped, and then suddenly sped away. As the vehicle turned into an apartment complex, the passenger door opened and a passenger jumped from the car and fled on foot. Munoz pursued the passenger. The vehicle continued to the apartment's entrance gate and then came to a quick stop. Carraway attempted to position himself next to the guardhouse to get some cover, and he shouted commands for the driver to show his hands. The driver did not obey his command. As Carraway reached the vehicle, its door opened and he could distinctly see the driver reach for something on her right side with both hands. She ignored his commands. As

24

she came up, she turned quickly towards Carraway and had her hands together just below shoulder level and appeared to be holding a shiny object in her right hand. Carraway discharged his weapon one time and hit the driver in the left hand. The driver was not holding a gun but rather wearing bracelets. IAD found that the shooting was intentional and justified. (Doc. No. 134, Ex. 54.)

**Officer R. Jennings and A.S. Rendon**

On March 4, 2008, Officer P.J. Straker observed a truck run a red light. Straker followed the vehicle, which was being driven recklessly at a high rate of speed, and requested that mark units join him. The vehicle fled from the marked units. The truck spun out of control and became stuck in the mud. Officer Rendon stated that he heard officers order the suspect to the ground but that he kept trying to get around the officers. Rendon then heard two or three shots but could not tell if they were coming from the officers or the suspect. The suspect then began backing the truck toward the officers, and Rendon fired at the truck's left tire, missing.

The suspect got out of the mud and drove a short distance before he veered off of the road, through a ditch, and into a wooded area. The truck came to a brief stop, and Jennings, thinking that the suspect was either injured or incapacitated, approached the vehicle. As Jennings approached, the suspect attempted to rev the engine, and Jennings shot at the right rear tire. Jennings attempted to open the driver's door, but it was locked. The suspect was trying to revive the engine, but the truck did not move. Jennings ordered the suspect out of the truck, and the suspect dropped to the right and reached below the seat. Jennings fired one shot. The suspect then put the truck in reverse and Jennings again fired at its tires. The suspect drove the truck in the direction of many officers who were attempting to conduct a felony traffic stop.

Officer Anderson had to jump on the trunk's hood to avoid being run over. Anderson, Rendon, Officer Maldonado, and several Harris county deputies discharged their weapons at the suspect.

IAD found that the shootings were intentional and justified, but that Jennings violated Policy 600-34 and 200-8 on sound judgment and supervisory conduct. (Doc. No. 134, Ex. 55.)

The IAD reports presented by Plaintiff are ultimately insufficient to show a pattern or practice of HPD officers violating Policy 600-34 and using excessive force as a result. In all but Officer Hillman's case, HPD found that the officer's use of force was intentional and justified. Furthermore, many of the cases are factually distinguishable from the one before the Court— some of the suspects were injured once they had exited the vehicle, or while they were aiming a vehicle at the officer. The Fifth Circuit has explained that "the plaintiff must demonstrate at least a pattern of similar incidents in which the citizens were injured." *Cano*, 280 Fed. Appx. at 406 (quoting *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005)). These fifteen incidents also span a period of ten years. This is ultimately insufficient to establish a pattern or practice in a large urban area. See *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) ("Eleven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces."). Furthermore, the Court's reliance on these IAD records alone would require the City "to defend 'cases within cases' from historical records" to justify shootings that occurred, in some cases, ten years ago. *See id.*

Plaintiff also has produced press statements made by HPD Police Chief Bradford in 1999, indicating that HPD was going to have to change the way it trained its officers to conduct high speed vehicle approaches. (Doc. No. 134, Ex. 35.) As a result, Plaintiff claims that HPD knew that its high risk vehicle approach training was inadequate but willfully failed to retrain its

officers. First, Bradford's statements in the newspaper articles are hearsay and therefore not competent summary judgment evidence. *Cano v. Bexar County*, 280 Fed. Appx. 2008 WL 2329203, at *406 (5th Cir. 2008) (citing *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005)). Second, Plaintiff has not demonstrated that, following Bradford's statements in 1999, HPD did not somehow modify its high risk vehicle approach training.

### a. Ratification

Plaintiff asserts separately that the City is liable under *Monell* because of its failure to discipline officers who violate its high risk vehicle approaches policy ("Policy 600-34"). Plaintiff points to the IAD reports as establishing a pattern of failing to discipline officer shootings in the context of a high risk vehicle approach.

In the instant case, Houston did not fail to discipline Officers Foster and Washington after Carnaby's death. They ordered an investigation, and the IAD report determined that both officers violated Policy 600-34 and HPD's General Order 200-8, which addresses sound judgment and supervisory conduct. (Doc. No. 75, Ex. G.) Foster was given a written reprimand, and Washington was suspended for one day without pay. (Doc. No. 131, at 11 & n.1.) While a municipality can be found to have an unconstitutional custom or policy based on its failure to discipline an officer after she commits an unconstitutional act, the Fifth Circuit generally considers the question where a municipality actually fails to discipline employees. *See, e.g.*, *Lopez-Rodriguez v. City of Levelland*, 100 Fed. Appx. 272, 274 (5th Cir. 2004) (not selected for publication); *Fraire v. City of Arlington*, 957 F.2d 1268, 1278-79 (5th Cir. 1992); *Berry v. McLemore*, 670 F.2d 30, 33-34 (5th Cir. 1982), *overruled on other grounds by Int'l Woodworkers of Am. v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986). In this case, where inadequate officer discipline and not failure to discipline is at issue, the "question is how

27

to prove the existence of such a policy." *Piotrowski v. City of Houston*, 237 F.3d 567, 581-82 (5th Cir. 2001). As the Fifth Circuit has noted, one indication could be a "purely formalistic investigation in which little evidence was taken, the file was bare, and the conclusions of the investigation were perfunctory." *Id.* at 582. That is not the case here. The IAD report detailed the incident, interviewed both Foster and Washington, and the investigator recommended that charges be sustained against them. (Doc. No. 75, Ex. G.) Similarly, in the IAD reports reviewed above, each incident was reviewed thoroughly, and where breaches of policy were found, officers were reprimanded, up to and including suspension from duty. *See supra* pp. 11-21. Furthermore, even if HPD inadequately disciplined officers in some of the cases, a handful of such instances spanning a decade is inadequate to show a pattern representing a policy. *See Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002).

The Court understands that the Plaintiff may find the disciplinary action to be inadequate given the tragic result of Carnaby's traffic stop. But Plaintiff has not provided any evidence that the pattern of discipline is "so inadequate as to tacitly encourage unconstitutional conduct or to give the police officers the idea that the [City is] deliberately indifferent to the occurrence of the conduct." *Berry v. McLemore*, 670 F.2d at 33 (5th Cir. 1982). In the absence of such evidence, at worst this is an "isolated decision" to inadequately discipline. *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992). The Fifth Circuit has made clear that no custom or policy may be inferred from such isolated decisions. *Id.* at 1278-79.

The one arguable exception, a case cited by Plaintiff, is *Grandstaff v. City of Borger*, 779 F.2d 1129 (5th Cir. 1986). In that case, a group of police officers opened fire on a man they mistook for a fugitive. The evidence reflected "repeated acts of abuse" leading to the man's death. In addition, in the aftermath of the case, several police officers proved evasive and

28

contradictory in their testimony. *Id.* at 166 n.1. One officer even sold his weapon, which had been fired into the innocent man's home during the incident, without its ever being inspected by the police department. *Id.* The *Grandstaff* court was incredulous that there were "no reprimands, no discharges, and no admissions of error" following the incident, and asserted that that was sufficient evidence to conclude that "it was accepted as the way things are done and have been done in the city of Borger." *Id.* at 171.

Grandstaff "has not enjoyed wide application in this Circuit." *Snyder v. Trepagnier*, 142 F.3d 791, 797 (5th Cir. 1998). The Fifth Circuit has subsequently limited *Grandstaff's* application to "extreme factual situations" analogous to those presented in that case. *Id.* at 798 (quoting *Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986)). This Court cannot say that the facts of this case are similar to *Grandstaff's*. The investigator conducted an earnest IAD report and recommended that charges be sustained against the officers, who were both subsequently reprimanded. Thus, the City did not tacitly establish a policy of encouraging officers to use excessive force by failing to discipline, or inadequately disciplining, police officers.

### C. Plaintiff's State Law Claims

Plaintiff asserts state law claims against Houston, pursuant to the Texas Torts Claims Act ("TTCA"). Specifically, Plaintiff argues that Foster and Washington were employees of Houston, acting within the course and scope of their employment, and that Carnaby's death was caused by the use of tangible personal property, a gun. (Pls. Compl. ¶¶ 22-23.) Plaintiff avers that Foster and Washington were each negligent in using their firearms, discharging their firearms, maintaining their firearms, and committing other acts of omission or commission which constituted negligence and were a proximate cause of Carnaby's death. (*Id.* ¶ 24.) As a result, Plaintiff claims that Houston is liable under the TTCA for the negligence of Foster and

29

Washington which proximately caused Carnaby's death. (*Id.* ¶ 25.) Houston argues that, under

the TTCA, it is not liable for intentional torts. Plaintiff does not directly respond to this

argument.

The TTCA provides that the state's governmental units are liable "for 'personal injury

and death so caused by a condition or use of tangible personal property or real property if the

governmental unit would, were it a private person, be liable to the claimant according to Texas

law.'" *Tex. Dep't of Pub. Safety v. Rivera*, No. 13-01-293-CV, 2002 WL 720706, at *3 (Tex.

App.—Corpus Christi 2002) (not designated for publication) (quoting TEX. CIV. PRAC. & REM.

CODE § 101.021(2)). "[A] municipality engaged in a function defined by the Legislature to be

governmental is entitled to governmental immunity provided that the Texas Legislature has not

otherwise authorized a waiver of this immunity." *McDonald v. City of the Colony*, No. 2-08-263-

CV, 2009 WL 1815648, at *4 (Tex. App.—Fort Worth 2009) (not designated for publication).

The TTCA does not, however, apply to claims arising out of an intentional tort. TEX CIV. PRAC.

& REM. CODE § 101.057(2). Also excluded from the TTCA are allegations against a

governmental unit arising out of the same conduct that formed the basis of the intentional tort

claims against its employee. *Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580 (Tex. 2001).

Both the Fifth Circuit and the Texas Court of Appeals have found that excessive force claims are

more akin to intentional torts and therefore cannot be brought against governmental units

pursuant to the TTCA. *See Goodman*, 571 F.3d at 394; *Morgan v. City of Alvin*, 175 S.W.3d

408, 418 (Tex. Civ. App.—Houston [1st Dist.] 2004, no pet.). The Fifth Circuit has also held

that negligent failure to train and supervise claims should not be pursued through the TTCA

because "a plaintiff must allege an injury resulting from the 'condition or use of tangible

personal or real property'" and "information is not tangible personal property, since it is an

30

abstract concept that lacks corporeal, physical, or palpable qualities." *Goodman*, 571 F.3d at 394 (citing *Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580 (Tex. 2001)).  Plaintiff's state law claims against Houston must therefore be dismissed as a matter of law.

### IV.     CONCLUSION

For these reasons, the Court holds that Plaintiff's Motion for Reconsideration is **DENIED** and Houston's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the ___ day of October, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS
ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY
AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN
SENT ONE BY THE COURT.**